UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DEALER TRADE NETWORK HOLDCO, LLC
D/B/A DEALER TRADE NETWORK,

      PLAINTIFF

v.

PAUL T. LYNCH,
SERVE:
122 McArthur Drive
Louisville, KY 40207

PAUL JACKSON,
SERVE:
2612 Hounz Lane
Louisville, KY 40223

TAYLOR LEONARD,
SERVE:
3809 Foreman Lane
Louisville, KY 40219

JOSHUA M. MAIER,
SERVE:
7701 Nevia Way
Louisville, KY 40220

PATRICK J. VOGT,
SERVE:
1678 Cheak Street
Louisville, KY 40213

ELITE AUTO EXCHANGE LLC,

SERVE VIA REGISTERED AGENT:
Cindys Florida LLC
8051 N. Tamiami Trail, Ste. E6
Sarasota, FL 34243

      DEFENDANTS.

CASE NO. 3:23-CV-411-CHB

*Electronically Filed*

**VERIFIED COMPLAINT**

Plaintiff, Dealer Trade Network Holdco, LLC d/b/a Dealer Trade Network (DTN), for its Verified Complaint against Defendants, Paul T. Lynch, Paul Jackson, Taylor Leonard, Joshua M. Maier, Patrick J. Vogt, and ELITE Auto Exchange LLC states:

## PARTIES

1.      DTN is a limited liability company organized under Kentucky law with a principal place of business at 13425 Eastpoint Centre Dr., Suite 130, Louisville, KY 40223.

2.      Lynch is an individual citizen of Kentucky who resides at 122 McArthur Dr., Louisville, KY 40207, and is a member of Elite.

3.      Jackson is an individual citizen of Kentucky and member of Elite who resides at 2612 Hounz Ln., Louisville, KY 40223, and is a member of Elite.

4.      Leonard is an individual citizen of Kentucky and member of Elite who resides at 3809 Foreman Ln., Louisville, KY 40219, and is a member of Elite.

5.      Maier is an individual citizen of Kentucky and member of Elite who resides at 7701 Nevia Way, Louisville, KY 40220, and is a member of Elite.

6.      Vogt is an individual citizen of Kentucky and member of Elite who resides at 1678 Cheak St., Louisville, KY 40213, and is a member of Elite.

7.      Elite is a limited liability company organized under the laws of Florida with its principal place of business in Louisville, Kentucky, and which transacts business in Kentucky, contracts to supply services in Kentucky, and has caused (and continues to cause) tortious injury by its acts in Kentucky.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because DTN asserts federal claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (the

DTSA) and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

9.      This Court has supplemental jurisdiction over DTN's state law claims

pursuant to 28 U.S.C. § 1367 because they derive from the same common nucleus of

operative facts as DTN's federal claims and "form part of the same case or controversy

under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a).

10.     This Court has personal jurisdiction over Lynch, Jackson, Leonard, Maier,

and Vogt because they are, and at all times relevant to this action were, Kentucky residents.

11.     This Court has personal jurisdiction over Elite because Elite's principal place

of business is in Kentucky.  In addition, DTN's claims against Elite arise from the acts or

omissions of Elite or its agents in transacting business in Kentucky, contracting to supply

services in Kentucky, and/or causing tortious injury in Kentucky.  *See* KRS

454.120(1),(2)(a)(1)–(4).

12.     The United States District Court for the Western District of Kentucky is the

proper venue for this action under 28 U.S.C. § 1391(b)(1) & (2) because it is the judicial

district in which all defendants reside, and the judicial district in which a substantial part of

the events or omissions giving rise to DTN's claims occurred.

### DTN's Business

13.     DTN is in the business of facilitating transactions between new car

dealerships across the country.  Established in 2004 in Louisville, Kentucky, DTN has

become the largest and most trusted new car dealer-to-dealer trade network in the country.

14.     DTN owns the domain name for "gmtrades.com," and that domain name

redirects to DTN's home website, "dealertradenetwork.com."  (*See* Delgado Decl. ¶ 6,

attached as Exhibit 13.)

15.     DTN manages the end-to-end trade and fulfillment process that moves new vehicles between franchised dealerships so that dealers can match their floor plan with local market demand.  Among other things, DTN analyzes national and local trends, identifies dealer inventory needs, connects dealers seeking to sell vehicles with dealers seeking to buy, and then coordinates the transaction and transfer of the vehicles.  Over its nearly 20 year history, DTN has cultivated a well-known reputation and trusted brand for its services.

16.     DTN's clients (new car dealerships) enjoy higher turn-rates and more profit when DTN's trading solutions put the right mix of vehicles on their lots.  DTN has worked with nearly 4,000 dealerships, including dealerships in each state in the continental United States.  It facilitates over $400 million in traded inventory annually.

17.     A typical transaction managed by DTN could include, for instance, a buying dealer in Texas obtaining a dozen Ford F-150s and six Ford Escapes from a selling dealer in New Hampshire.  DTN would pair the two dealerships together, facilitate the transaction and shipping, and be paid a commission for its services.

18.     Transactions are managed by DTN's team of sales representatives known as Inventory Consultants.  Inventory Consultants are client-facing and are the employees within DTN who are primarily responsible for developing, fostering, and maintaining DTN's goodwill and relationships with dealerships.  During the individual defendants' employment, DTN also employed Senior Inventory Managers, who performed the same sales duties as Inventory Consultants and also managed a team of Inventory Consultants.

19.     DTN's business is built on developing and maintaining strong relationships with the individuals working at the dealerships.

20.    Having the correct relationship and information for the correct individuals at dealerships responsible for buying and selling inventory is essential to DTN's business model.  Knowing and having goodwill with the correct contact at each dealership, along with what vehicles they are most interested in buying or selling, is key for marketing to dealerships and facilitating transactions.

21.    Through extraordinary efforts and many years' expenditure of time and money, DTN has developed and maintained a proprietary database containing accurate and up-to-date contact information for over 16,000 dealerships (the "Database").  The Database also contains commercially valuable information such as details about vehicles a dealership is looking to buy or sell, how individuals prefer to be contacted, notes from prior interactions with a dealership or individual, details from prior transactions DTN facilitated, and specific inventory data.  (*See* Delgado Decl. ¶ 10.)

22.    Although the general "front desk" contact information for dealerships may be publically available, the specific identities and direct contact information for the particular individuals at each dealership who are responsible for managing inventory is not.  Nor is the customer information that DTN's Inventory Consultants track after phone calls and other contacts with clients.  As a result, DTN must devote substantial effort and resources to obtain and maintain that information.

23.    Maintaining the accuracy of the Database can be particularly challenging given the significant turnover amongst staff at dealerships and amongst the 16,000-plus new car dealerships themselves across the country.  As a result, DTN is constantly working to ensure that the Database is up-to-date and as accurate as possible.

24.    DTN pays contractors solely to obtain updated information for the individuals responsible for managing inventory at the more than 16,000-plus new car dealerships in the continental United States.  It often takes multiple calls across several days, weeks, or months to obtain the relevant information for any particular dealership.

25.    Additionally, DTN's Inventory Consultants are expected to assist with the ongoing maintenance of the Database to ensure their accuracy and completeness.

26.    For example, when Inventory Consultants are assigned to a new territory, they are strongly encouraged to contact every single dealership in the area to network and obtain updated contact information for the Database.  Inventory Consultants are also tasked with adding notes about their interactions and contacts and updating the Database as contacts change through attrition at dealerships or through mergers and acquisitions.

27.    Inventory Consultants occupy positions of utmost trust and confidence with DTN, as DTN entrusts them to foster customer goodwill and keep confidential the information contained in the Database, as well as other DTN confidential information.

28.    In addition to paying individuals to network and call dealerships, and in addition to paying its Inventory Consultants in part to develop and maintain the Database, DTN also pays outside data vendors to obtain contact information for dealerships.  Since November 2019, DTN has paid approximately $4,000 per month in vendor fees for dealership, contact, and inventory data.  Since April 2021, DTN has paid approximately $20,000 annually for vendor subscriptions to supplement contact data.  DTN also has paid vendors in excess of $50,000 to verify the email addresses contained in the Database.

29.    DTN derives significant economic value from the fact that the information contained in the Database is not generally known or readily ascertainable by proper means

to other persons who could obtain economic value from its disclosure or use.  DTN enjoys a substantial advantage over competitors because of the size and accuracy of the Database.

30.     Without the correct identities or contact information for individuals responsible for managing inventory, or the dealership inventory and transaction data that DTN has compiled over the years, DTN's competitors cannot get their foot in the door at dealerships.  Armed with the information contained in the Database, including notes and other data about thousands of individuals and dealerships compiled over many years, DTN is better positioned than its competitors to market to the dealerships, form strong relationships with the relevant decisionmakers, and ultimately facilitate deals.  Because the Database is used by DTN to market to and facilitate deals among dealerships nationwide, the Database is used and intended to be used by DTN in interstate commerce.

31.     The Database also powers DTN's proprietary automated marketing software.  This custom-built software leverages the information from the Database combined with proprietary algorithms to send highly specific offers to the right contact at the right dealership at the right time based on market insights.  Without the information from the Database, the software would not be able to function.  (*See* Delgado Decl. ¶ 11.)

32.     DTN also tracks information from each transaction it facilitates.  DTN compiles and analyzes this historical transaction data in a number of ways, which allows DTN to further hone its marketing and transaction facilitation efforts and maximize the number of successful transactions it facilitates and the profitability of each transaction.  (*See* Delgado Decl. ¶ 12.)

33.     Among other things, DTN uses this compiled data to generate catalogs in its Database with aggregate historical transaction information for each dealership that DTN

has worked with. DTN maintains an up-to-date catalog that lists each dealership that has been a buyer in a transaction facilitated by DTN as well as (i) the number of units purchased by a given dealership, (ii) the fee generated by transactions done with a given dealership, and (iii) DTN's average profit per unit purchased by a given dealership (the "Buyers Data List"). (*See* Delgado Decl. ¶ 13.)

34.    DTN also maintains an up-to-date catalog that lists each dealership that has been a seller in a transaction facilitated by DTN as well as the total number of units DTN has sold for a given dealership (the "Sellers Data List"). (*See* Delgado Decl. ¶ 14.)

35.    DTN takes careful efforts to maintain the secrecy of the Database, which includes the Buyers Data List and the Sellers Data List. (*See* Delgado Decl. ¶ 15.)

36.    DTN protects the secrecy of its Database and its relationships with dealerships by requiring Inventory Consultants to execute employment agreements containing confidentiality, noncompetition, and client nonsolicitation provisions. DTN uses these restrictive covenants to protect itself from unfair competition by former employees and to protect the company's goodwill among clients.

37.    DTN's Employee Handbook also explains employees' confidentiality obligations, and DTN regularly emphasizes the secrecy of its Database and that employees are to treat the information in the Database as strictly confidential.

38.    DTN also currently prohibits Inventory Consultants from contacting dealerships or having contact information in masses for dealerships they are not assigned.

39.    In addition, in recognition of the sensitivity of its Database and the harm it would cause to the company if they were disclosed to third parties, DTN has put in place

additional security measures to protect the Database.  For one, the Database can only be accessed through internal password-protected systems.  (*See* Delgado Decl. ¶ 15.)

40.    DTN has taken steps to limit employees' access to information in the Database.  Starting in approximately 2021, DTN disabled direct access to the Database by adding code to hide the navigation component on the Main Menu.  DTN also disallowed design view and disallowed users to access direct tables/queries/forms.  (*See* Delgado Decl. ¶ 16.)

41.    In November 2022, DTN rolled out the first phase of a new software system called "Retool" for its employees to use internally.  Retool affords DTN more control over its data and grants fewer permissions for employees to access data, including the Database. (*See* Delgado Decl. ¶ 17.)

42.    These measures were designed and intended to limit employees' access to only the specific information necessary for their given role and assignments.  (*See* Delgado Decl. ¶ 18.)

43.    On March 10, 2023, DTN fully retired its former software system.  By April 3, 2023, all employees had been migrated to working in Retool, and all data, including the Database, is accessible only through Retool.  Inventory Consultants, including the individual defendants here, were informed in January that, starting in April, they would have more restricted access to the Database as a result.  (*See* Delgado Decl. ¶ 19.)

44.    Retool does not permit employees to download the Database without executive approval.  Absent executive approval, Inventory Consultants have "view only" access to the Database and cannot download copies of the Database.  (*See* Delgado Decl. ¶ 20.)

### The Individual Defendants' Employment with DTN

45.     The individual defendants were all employed as Inventory Consultants or Senior Inventory Managers with DTN until June 2023.  Each was a highly paid employee and well-performing Inventory Consultant or Senior Inventory Manager.  In 2022, Lynch earned $217,116; Jackson earned $312,802; Leonard earned $359,013; Maier earned $477,075; and Vogt earned $311,400.

46.     The individual defendants' combined sales territories spanned nearly all of the lower 48 states.  Between January 1, 2021, and the time of their separations:

   (a)     Lynch had accounts in 42 states;

   (b)     Jackson had accounts in 38 states;

   (c)     Leonard had accounts in 41 states;

   (d)     Maier had accounts in 37 states; and

   (e)     Vogt had accounts in 40 states.

47.     DTN provides email addresses with a "@dealertradenetwork.com," "@dealertrades.network," "@dealertrade.network," "@gmtrades.com," or "@dealertrades.net" domain to its employees to use during their employment with DTN, both internally and externally while conducting business on behalf of DTN.  (*See* Delgado Decl. ¶ 4.)

48.     Some employees at DTN also created and used other email accounts to conduct business on behalf of DTN.  At a minimum, Josh Maier created and used joshmdealertrades@gmail.com, and Paul Lynch created and used paul.dealertrades@gmail.com, paul@dtnsales.com, dtninventory@gmail.com, paulgmtrades@gmail.com, cadillacdealertrades@gmail.com, gmcdealertrades@gmail.com,

paul.tradenetwork@gmail.com, dtnlocates@gmail.com, and p.lynch@dtnsales.com.  Maier

and Lynch regularly used these accounts while employed at DTN to correspond with DTN

clients and conduct business on behalf of DTN.  (*See* Delgado Decl. ¶ 5.)

49.    Each individual defendant executed an employment agreement with

restrictive covenants that, among other things, prohibit them from competing with DTN,

soliciting DTN's clients, and using or disclosing DTN's confidential information.

50.    Lynch and Dealer Trade Network, LLC entered into a Confidentiality, Non-

Disclosure and Non-Compete Agreement on July 20, 2016, which is attached as Exhibit 1

("Lynch's Employment Agreement").  As consideration, Lynch received additional bonus

compensation and an option to purchase an ownership interest in DTN, as provided in the

Bonus Agreement and Option to Purchase that the parties executed contemporaneously

with Lynch's Employment Agreement.

51.    Lynch's Employment Agreement provides, in relevant part:

> 3    The Employee does hereby acknowledge and agree that all customers and accounts on the books of the Employer (including, but not limited to, those which may be produced by the Employee) together with all records with respect thereto and all goodwill in connection therewith and all lists and records of leads of prospects for new accounts are the exclusive property of the Employer and shall continue so both during and forever after the termination of the Employee's employment with the Employer which may be affected by either party at will with or without cause.  The Employee specifically acknowledges that he/she has no ownership interest or rights of any kind in or to the aforesaid assets.

4       The Employee agrees that all information and records concerning accounts of customers of the Employer including information regarding buying trends, incentive programs, buying and selling dealerships, specific and nonspecific sales methods and all other information relative to the conduct of Employer's business which are neither generally known by or available to the public is confidential information constituting trade secrets and will be treated by him as such and that he will not hereafter, during the course of his employment and forever thereafter, directly or indirectly, make use of any such information or other confidential information of the Employer for his own benefit nor divulge any information nor reveal any such information including customer lists or data concerning services provided to or on behalf of customers, to anyone. By signing this Agreement, the Employee warrants that he has not and will not, at any time hereafter, make, create or retain copies of any such records.

5.       Employee agrees that for the period Employee is employed by the company and for a Five (5) year period immediately following the termination of Employee's employment with the Employer regardless of the reason for said termination, Employee will not directly or indirectly, on Employee's own behalf or as an individual, shareholder, director, officer, principal, agent, consultant, employee, associate or co-owner with anyone else; (i) divert business from or interfere with the goodwill of the Employer; (ii) solicit, attempt to obtain, accept or transact business from any customer or account on the books of the Employer at the time Employee's employment shall terminate or on the books of Employer at the time within 12 months prior thereto or from any person, firm or corporation, the business of which has been solicited on behalf of Employer by the Employee or others in the employ of the Employer, or which has become a prospect of Employer, at any time during the 12 months prior to the termination of Employee's employment; (iii) aid or assist anyone other than the Employer in soliciting, attempting to obtain or accepting business of any nature from any such customer or account; (iv) become interested in any such competitive business or service directly or indirectly as an individual, partner, member, director, officer, principal, agent, employee or creditor.   The restrictions of this paragraph do not apply to any products or services which are not in competition with employer's products or services. For purposes of this Agreement, products and services which do qualify as competition are those which relate to or otherwise involve the facilitation of dealer trades of new cars between new car dealers..

8.       The Employee acknowledges that his employment by the Employer is a full time commitment and that he will devote his full and exclusive working time and efforts on behalf of the Employer in accordance with the rules, regulations and operating procedures established from time to time by the Employer's officers and directors. The Employee further acknowledges that any and all revenue which may be produced by him during the continuance of his employment shall be placed exclusively through the facilities of and in the name of the

9.    The Employee further agrees that a violation of his agreements set forth in this Agreement will cause such damage to the Employer as will be irreparable and the exact amount of which will be impossible to ascertain, and for that reason further agrees that the Employer shall be entitled, as a matter of right, to an injunction out of any court of competent jurisdiction, restraining any breach or threatened breach thereof by the Employee, his/her employees, partners or agents, such right to an injunction, however, to be cumulative and in addition to whatever other remedies the Employer may have with respect thereto. Employee further agrees that if he violates this agreement in any way, the Company shall be entitled to recover its legal fees and costs associated with enforcing this Agreement. Employee represents and acknowledges that the enforcement of any remedy under this Agreement will not prevent Employee from earning a livelihood because Employee's past work history and abilities are such that Employee can reasonably expect to find work in other lines of business. Employee further represents that Employee has read the entire Agreement and that Employee fully understands all of the terms and conditions set forth herein.

14.    This Agreement shall be governed and enforced with the laws of the Commonwealth of Kentucky. If any court holds any provision of this Covenant or the application of the provision to any person or circumstances invalid, the remaining provision to any person or circumstances invalid, the remaining provision of this covenant and their application shall not be affected. If any court shall finally determine that any covenant of this Agreement is unenforceable as written, this Agreement may be modified to whatever extent the

court deems reasonable and such covenants as modified may be enforced as contemplated herein.

52.    Jackson and Leonard separately entered into identical employment agreements with Dealer Trade Network, LLC.

53.    Jackson executed his employment agreement when he was hired on June 7, 2021, attached as Exhibit 2 ("Jackson's Employment Agreement"). Likewise, Leonard signed his employment agreement when he was hired on February 20, 2019, attached as Exhibit 2 ("Leonard's Employment Agreement").

54.    The relevant portions of their employment agreements provide:

– 12 –

6. **CONFIDENTIALITY.** Employee recognizes that Employer has and will have information regarding the following: Knowledge of buying trends, incentive programs, buying and selling dealerships, specific and nonspecific sales methods and all other vital information (collectively "Information") which are valuable, special or unique assets of Employer. Employee agrees that Employee will not at any time or in any manner, either directly or indirectly, divulge, disclose or communicate any Information to any third party without prior written consent of Employer. Employee will protect the Information and treat it as strictly confidential. A violation by Employee of this paragraph shall be a material violation of this Agreement and will justify legal and/or equitable relief.

**(6a) NON-COMPETE COVENANT.** For a period of five years after termination of employment by either party, the signing party will not directly or indirectly engage in any business that competes with Dealer Trade Network, LLC. This covenant shall apply to the geographical area that includes the continental United States as is practical through internet, toll phone lines and mail.

**(6b) NON-SOLICITATION COVENANT.** For a period of five years after the termination of employment by either party, the signing party will not directly or indirectly solicit business from, or attempt to sell, license or provide the same or similar products or services as are now provided to any customer or client of Dealer Trade Network, LLC.

Further, for a period of five years after the termination of employment by either party, the signing party will not directly or indirectly solicit, induce or attempt to induce any employee of the Dealer Trade Network, LLC to terminate his or her employment with Dealer Trade Network, LLC. It is agreed that if the signing party violates the terms of this Agreement irreparable harm will occur and money damages will be due in the amount of $5,000 per day, plus all legal expenses incurred by the Employer in seeking resolve. These money damages will be

insufficient to fully compensate Dealer Trade Network, LLC. Therefore, Dealer Trade Network, LLC will be entitled to seek injunctive relief (i.e., a court order that requires the signer to comply with this Agreement) to enforce the terms of this Agreement.

55.     On February 1, 2023, Maier and Vogt separately entered into identical employment agreements with DTN. Maier's agreement is attached as Exhibit 3 ("Maier's

– 13 –

Employment Agreement"), and Vogt's as Exhibit 3 ("Vogt's Employment Agreement").  As consideration, both Maier and Vogt received a promotion to Senior Inventory Manager and bonus opportunities.

56.    Their respective agreements provide, in relevant part:

> 6.  **Confidentiality.** Employee always agrees that during Employee's employment and following the conclusion of Employee's employment, whether voluntary or involuntary, Employee will hold in the strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not also an employee of the Company or to any employee of the Company who does not also have access to such Confidential Information, without the express written authorization of the President of the Company.
>
>    a.  "Confidential Information" shall mean any trade secrets or Company proprietary information, including but not limited to manufacturing techniques, processes, formulas, customer lists, inventions, experimental developments, research projects, operating methods, cost, pricing, financial data, business plans and proposals, data, and information the Company receives in confidence from any other party, or any other secret or confidential matters of the Company. Additionally, Employee will not use any Confidential Information for Employee's benefit or to the Company's detriment during Employee's employment or after that. The employee also certifies that employment with the Company does not and will not breach any agreement or duty that Employee must anyone concerning confidential information belonging to others.

> 7.  **Non-Compete Covenant.** The Employee agrees explicitly that for a period of (2) two years after the Employee is no longer employed by the Company, the Employee will not engage, directly or indirectly, either as proprietor, stockholder, partner, officer, employee, or otherwise, in the same or similar activities as were performed for the Company in any business within a 400-mile radius of the Company which distributes or sells products or provides services identical to those distributed, sold, or provided by the Company at any time during the (2) two years preceding the Employee's termination of employment.

> 8.  **Non-Solicitation of Customers and Clients.** Employee agrees that for (2) two years after the Company no longer employs Employee, Employee will not directly or indirectly solicit, agree to perform, or perform services of any type that the Company can render ("Services") for any person or entity who paid or engaged the Company for Services, or who received the benefit of the Company's Services, or with whom Employee had any substantial dealing while employed by the Company. However, this service restriction applies only to those rendered by the Employee or an office or unit of the Company where the Employee worked or over which the Employee had supervisory authority. This restriction also applies to assisting any employer or other third party.

57.    Effective February 17, 2021, Dealer Trade Network, LLC was acquired through an asset-purchase deal by TYP64 Acquisition Holding Company, which subsequently changed its name to Dealer Trade Network Holdco, LLC d/b/a Dealer Trade Network (the Plaintiff in this case).  Lynch's, Jackson's, and Leonard's Employment Agreements were included in the asset purchase and were assigned to Dealer Trade Network Holdco, LLC d/b/a Dealer Trade Network.  Maier's and Vogt's Employment Agreements were executed after this transaction.

58.    In conjunction with the launch of Retool in the fall of 2022, Inventory Consultants and Senior Inventory Managers executed a Proprietary Information and

Inventions Agreement ("PIIA"). In exchange for executing the agreement, Inventory Consultants and Senior Inventory Managers gained access to Retool and received additional tools that would enable them to be more successful in facilitating deals and, ultimately, earning more commissions.

59.    Each of the individual defendants separately executed a PIIA with DTN (collectively attached as Exhibit 4.) The PIIA clarifies that DTN owns all "trade secret rights" and "*sui generis* database rights" (collectively defined as "Inventions") related to any "know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by [the employee] during the term of [the employee's] employment with Company" that related to DTN's business. (PIIA ¶ 2.)

60.    In executing the PIIA, the individual defendants each agreed "that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company or the business . . . constitute 'Proprietary Information.' . . . I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to Company all items containing or embodying Proprietary Information . . . ." (*Id.* ¶ 4.)

61.    Consistent with their employment agreements, the PIIA also reiterates that the individual defendants are prohibited from "engag[ing] in any activity that is in any way competitive with the business or demonstrably anticipated business of Company" and from

"assist[ing] any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company" during their employment with DTN.  (*Id.* ¶ 6.)

62.    The individual defendants also each recognized in the PIIA: "I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond."  (*Id.* ¶ 9.)

63.    The PIIAs also state: "[T]his Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of Company, I have obligations to Company which are not set forth in this Agreement."  (*See id.* ¶ 7.)

64.    Each of the individual defendants separated from their employment with DTN in June 2023.

65.    Lynch was terminated on June 1, 2023.  In its termination letter, DTN reminded him of his contractual obligations pursuant to Lynch's Employment Agreement.

66.    Maier and Vogt resigned on June 12, and Leonard resigned on June 13.  DTN sent each of them letters confirming their resignation and reminding them of their contractual non-compete and non-solicitation obligations under their respective employment agreements.

67.    Jackson resigned on June 16.  The next business day, June 19, DTN sent Jackson a letter confirming his resignation and reminding him of his obligations under his employment agreement.

### The Individual Defendants Breach Their Agreements with DTN

68.     Despite being reminded of their contractual obligations, the individual defendants began violating their respective employment agreements with DTN by creating, operating, and working for Elite, a business that they formed to compete with DTN. All of the individual defendants are members of Elite that work for and transact business on behalf of Elite in Louisville, Kentucky.

69.     The individual defendants, through an authorized representative, formed Elite Auto Exchange LLC effective June 19, 2023, by filing Articles of Organization with the Florida Department of State's Division of Corporations. But the individual defendants were preparing to compete with DTN and solicit DTN customers well before Elite was formed.

70.     On July 13, 2023, one of DTN's Inventory Consultants received an email from a dealership indicating that Maier was working for a competitor business known as "Elite." (*See* July 13, 2023, Email, attached as Exhibit 5.)

71.     On July 18, 2023, a sales manager at a client dealership was emailing with Paul Lynch at his paul@eliteautoxchange.com address. The sales manager forwarded their email thread to one of his colleagues and copied Lynch to the forwarded email. However, when doing so, the sales manager (perhaps accidentally) used Lynch's paul.lynch@dealertrades.network address instead of his Elite email address. The email sent to paul.lynch@dealertrades.network auto-forwarded to DTN's Chief Technology Officer, Daniel Delgado.

72.     These two incidents led DTN to investigate the DTN desktop computers that were used by Maier and Lynch during their respective employments with DTN.

73.    During their employments with DTN, Maier and Lynch downloaded and used a program called Thunderbird on their DTN work computers, which allows users to manage multiple email accounts.  They used Thunderbird to manage the email accounts listed in Paragraph 48 as well as their "@dealertradenetwork.com," "@dealertrades.network," "@dealertrade.network," "@gmtrades.com," or "@dealertrades.net" email accounts.  (*See* Delgado Decl. ¶ 7.)

74.    Thunderbird automatically saves all data managed through it, including all sent or received emails, locally on the hard drive on the computer on which it is installed. The emails and transfer sheets attached to this complaint as Exhibits 6, 7, 9, 10, 11, and 12 were gathered from the hard drives of Maier and Lynch's DTN work computers.  (*See* Delgado Decl. ¶ 8.)

75.    At least one of the individual defendants began preparing to launch a business to compete DTN as early as March 1, 2023.  That morning, Lynch surreptitiously extracted and downloaded the Buyers Data List and the Sellers Data List (part of the Database) dating back to January 1, 2010—which contains over 1650 buying dealerships and over 3200 selling dealership—and sent them to one of his non-DTN email addresses (alazettiproperties@gmail.com).[1]  Later that afternoon, he did the same with the dealership contact and sales information portions of the Database.  (*See* March 1–2, 2023, Emails, attached as Exhibit 6; Delgado Decl. ¶ 21.)

76.    The next day, Lynch extracted and downloaded a list of email addresses for nearly 10,000 dealership contacts and sent it to the same non-DTN email address.  (*See* Delgado Decl. ¶ 21.)

---

[1] Per the Kentucky Secretary of State's website, Lynch is the registered agent of Alazetti Investments, LLC.

77.     Lynch downloaded and sent the Database to his non-DTN email address just weeks before Retool was fully implemented and Lynch lost the ability to download the Database.  Lynch was aware that Retool was being fully rolled out in April and that he would soon lose the ability to download the Database.  (*See* Delgado Decl. ¶¶ 19, 22.)

78.     Within a few months thereafter, the individual defendants' had formalized their plan to form a competitive entity and began to implement it.

79.     On June 4, 2023, while all but Lynch were still employed by DTN, the individual defendants anonymously registered three domain names: eliteautoxchange.com, eliteautoexchanges.com, and eliteauto.exchange.  Elite uses each of these domains to conduct its business and compete with DTN.

80.     No later than June 7, 2023—days after Lynch was terminated and while the other individual defendants were still employed by DTN—the individual defendants had a formal business plan for Elite.  Lynch used one of his DTN email addresses to send the business plan to one of his non-DTN email addresses.  (*See* June 7, 2023, Email Attaching Elite Business Plan, attached as Exhibit 7.)

81.     In the business plan, each of the individual defendants is listed as a "member/partner" of Elite, and their intent to create a business that competes with DTN is explicit.  The very first sentence states: "Our business, Elite Auto Exchange, LLC, aims to establish a . . . business for trading and wholesaling new cars between new car OEM dealerships."  Similarly, the plan states Elite's mission is "to facilitate and simplify the way new car dealerships trade vehicles by providing streamlined and secure transactions that maximize efficiency, profitability, and inventory availability."

82.    The Elite business plan includes numerous other statements evidencing the individual defendants' intent to compete with DTN:

(a)    "*Target Market:* New car dealerships across the contiguous United States seeking efficient, reliable, and profitable methods for trading vehicles."

(b)    "*Transaction Facilitation:* Our team of experienced professionals will handle all aspects of the trade process, including negotiation, paperwork, vehicle inspection, and logistics.  We will ensure a seamless and secure transfer of vehicles between participating dealerships."

(c)    "*Logistics and Coordination:* Our team will manage all logistics involved in the vehicle transfer, including arranging transportation, coordinating vehicle inspections, and ensuring proper documentation."

83.    The business plan also shows that the individual defendants, as owners and agents of Elite, planned to solicit DTN customers:

(a)    Under the plan's "Marketing and Sales" heading, it states that Elite's "[p]articipation in automotive industry events, trade shows, and conferences will provide opportunities to network with dealerships, generate leads, and build industry relationships."

(b)    The plan states that Elite's "dedicated sales team will engage in direct outreach to dealerships, highlighting the benefits of using utilizing [sic] our services, providing demonstrations and customer testimonials, and offering personalized assistance for liquidating or acquiring new car inventory."

84.    The closing paragraph of the plan calls the competing business: "New Car Dealer Trade Network."

85.     Elite's website confirms that the Defendants put their plan to compete with DTN into action and that Elite is engaged in the same business as DTN.

86.     As its website advertises, Elite is an "inventory management company" that helps "New Car OEM dealerships handle inventory acquisition as well as liquidation," and that "source[s] bulk orders for stock units and hard to find inventory." (*See* Elite Website Screenshots, last accessed August 4, 2023, attached as Exhibit 8.)

87.     Elite's website further boasts that it has "proven and successful relationships with 1000's of dealerships across the US," and that its "sales reps can assist you with your current or future new vehicle inventory needs by helping you purchase additional stock inventory" and "source new inventory bulk orders." (*See id.*)

88.     Despite being organized under the laws of Florida and listing a Florida address on its website, Elite's principal place of business is actually located at 1200 Envoy, Suite 1201, Louisville, Kentucky 40299.  The individual defendants perform their work for Elite out of the 1200 Envoy address and do not perform their work for Elite in Florida.

89.     Because they are members of and work for Elite, and because Elite is actively engaged in the same business as DTN, each of the individual defendants are in violation of their respective employment agreements.  For example:

(a)     Paragraph 5(iv) of Lynch's Employment Agreement prohibits him from "becom[ing] interested in any such competitive business or service . . . as an individual, partner, member, director, officer, principal, agent, employee or creditor" for a five year period following termination of his employment with DTN;

(b)     Paragraph 6a of Jackson's and Leonard's Employment Agreements prohibit them from "directly or indirectly engag[ing] in any business that competes with [DTN]" for a period of five years after termination of their employment; and

(c)     Paragraph 7 of Maier's and Vogt's Employment Agreements prohibit them from "engag[ing], directly or indirectly, either as proprietor, stockholder, partner, officer, employee, or otherwise . . . in any business within a 400-mile radius of [DTN] which . . . provides services identical to those . . . provided by [DTN] at any time during the (2) two years preceding [their] termination of employment."

90.     The individual defendants have further violated their respective employment agreements by doing business with, soliciting, or otherwise attempting to facilitate deals with dealerships that are DTN clients.

91.      For example, on June 1, 2023 (Lynch's last day at DTN), an employee of a Florida dealership and DTN customer responded to an automated marketing email sent from Lynch's DTN email address.  The employee stated that his dealership was seeking to purchase various models of Chevrolet vehicles and asked Lynch "[w]hat's the market like out there right now for" those particular models.  Over a month later, on July 10, 2023, Lynch replied to the employee from an Elite email account and told the customer to "[r]each out to me tomorrow" because Lynch was "back to work and settled in with the new company/ownership and ready to roll."  (*See* July 10, 2023, Email, attached as Exhibit 9.) Since his departure, Lynch has sent hundreds of email solicitations to dealerships, including to DTN's customers.

92.     As additional examples, on July 17 and 18, 2023, Lynch used emails from his time at DTN and information from the Database to send mass marketing emails to 1068

and 435 dealership recipients, respectively.  (*See* July 18, 2023, Email, attached as Exhibit 10.)

93.     Maier has sent hundreds of solicitations to DTN clients after his departure using email addresses from his time at DTN, including to DTN clients.  As one example, on July 25, 2023, Maier sent an email to DTN clients, including dealerships with which he had worked as a DTN employee, attempting to find a purchaser for three different packages of vehicles.  On July 5, 2023, Maier exchanged emails with the executive manager of an Ohio dealership and DTN client to assist with the sale of several high-end pickup trucks.  And on July 11, 2023, Maier sent an email soliciting a Pennsylvania dealership and DTN client, asking if the dealership had "[a]nything else you need to move right now?"  (*See* July 11, 2023, Email, attached as Exhibit 11.)

94.     The individual defendants have also facilitated transactions with a number of dealerships, including DTN clients.  For example: on July 13, 2023, Maier and Vogt facilitated the sale of two pickup trucks from Vernon Chevrolet Buick GMC to Simpson Chevrolet of Garde, which are both DTN clients; on July 18, Jackson and Maier closed the sale of a pickup truck from Heartland Chevrolet to Seguin Chevrolet, both DTN clients; on July 18, Lynch and Maier facilitated a transaction between Feldman Chevrolet of Novi and Seguin Chevrolet, both DTN customers; and on July 31, Maier and Leonard facilitated a transaction between Victorville Chevrolet and Don Hewlett Chevrolet Buick, both DTN customers.  (*See* Transfer Sheets, attached as Exhibit 12.)

95.     These are but a few examples of the many solicitations the individual defendants have sent to DTN clients and the transactions the individual defendants have facilitated for DTN clients in the short time since their departures.

96.     DTN has common law rights in the marks "Dealer Trade Network," "DTN," "Dealer Trades," and "GM Trades" as a result of its use of these marks in commerce— particularly when they are used to facilitate new car transfers and in emails from DTN Inventory Consultants.  And as a result of its use of these marks, car dealerships and others associate these marks with DTN.

97.     Maier and Lynch continue to use the same email addresses that they used at DTN to do business on behalf of Elite.  Maier's, Lynch's, and Elite's intentional misuse of "dealertrades" and "GMTrades" is an unlawful infringement on DTN's rights in the mark and will confuse customers as to source of Maier's, Lynch's and Elite's communications and services, and will dilute the goodwill associated with the mark that DTN has established through significant expenditure of time, money, and effort.

98.     The email accounts that Maier and Lynch used extensively at DTN and continue to use at Elite contains a significant amount of proprietary DTN information, including information from the Database, that Maier and Lynch had an obligation to return at the termination of his employment.  For instance, the email accounts contain a significant history of customer transactions, DTN pricing information, dealership lists, and customer information (like vehicle supply or demand) that is not publicly available.  Rather than returning this information, Maier and Lynch are now profiting from it.

## COUNT 1

### MISAPPROPRIATION OF TRADE SECRETS – DTSA AND KUTSA
### (AGAINST LYNCH, MAIER, AND ELITE)

99.     DTN restates and realleges all prior allegations as though restated here in full.

100.    The Database is a trade secret within the meaning of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq.*, and the Kentucky Uniform Trade Secrets Act (KUTSA), KRS 365.880, *et seq.*

101.    The email accounts that Lynch and Maier continue to use contain trade secrets within the meaning of the DTSA and KUTSA.

102.    By improperly taking, misusing, retaining, and/or sharing the Database, and by continuing to use the email accounts, Lynch, Maier, and Elite have misappropriated, and continue to misappropriate, DTN's trade secrets.

103.    Lynch's, Maier's, and Elite's actions alleged herein constitute violations of the DTSA, KUTSA, and principles of common law.

104.    Lynch's, Maier's, and Elite's continued use of the Database and email accounts are not authorized or consented to by DTN.

105.    The Database and information contained in the email accounts are not generally known to other persons nor readily ascertainable by proper means, and competitors can derive economic value from their disclosure or use.  Such information would be and is extremely valuable to DTN's competitors and would enable them to unfairly compete against DTN.

106.    DTN has engaged in substantial efforts, including great expense of time and money over the course of nearly two decades, to develop and maintain the Database.

107.    DTN has also engaged in reasonable efforts to maintain the secrecy of the Database, including but not limited to requiring individuals who had access to them to execute confidentiality agreements.

108.    As a direct and proximate result of Lynch's, Maier's, and Elite's wrongful misappropriation, which was done willfully and maliciously, DTN has sustained and will continue to sustain substantial damages.  Such damages include the actual loss caused by the misappropriation, and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss.

109.    Because Lynch's, Maier's, and Elite's wrongful misappropriation was done willfully and maliciously, DTN is further entitled to punitive damages.

110.    In addition to damages that may be remedied through an award of monetary relief, as a result of Lynch's, Maier's, and Elite's actions, DTN has suffered and continues to suffer irreparable harm by virtue of the unauthorized and unlawful use of its trade secrets.

111.    DTN has no adequate remedy at law or otherwise to address its irreparable injury, and the issuance of injunctive relief under 18 U.S.C. § 1836(b)(3)(A) and KRS 365.882 is necessary to prevent the actual and continuing misappropriation of its trade secrets and will serve the public interest.

### COUNT 2

### BREACH OF EMPLOYMENT AGREEMENTS
### (AGAINST LYNCH, JACKSON, LEONARD, MAIER AND VOGT)

112.    DTN restates and realleges all prior allegations as though restated here in full.

113.    Each individual defendants' respective employment agreement is a valid and enforceable contract.

114.    Each of the individual defendants has breached his respective employment agreement with DTN.  By engaging in the acts alleged herein:

(a)    Lynch has breached multiple provisions of Lynch's Employment Agreement, including but not limited to paragraphs 4, 5, 6, and 8;

– 26 –

(b)     Jackson has breached multiple provisions of Jackson's Employment Agreement, including but not limited to paragraphs 6, 6a, 6b, and 12;

(c)     Leonard has breached multiple provisions of Leonard's Employment Agreement, including but not limited to paragraphs 6, 6a, 6b, and 12;

(d)     Maier has breached multiple provisions of Maier's Employment Agreement, including but not limited to paragraphs 6, 7, and 8;

(e)     Vogt has breached multiple provisions of Vogt's Employment Agreement, including but not limited to paragraphs 6, 7, and 8.

115.    As a direct result of these breaches, DTN has lost profits, and its corporate name, its goodwill, and its standing with its customers and in the marketplace in general has been damaged.

116.    In addition to causing monetary damages to DTN, the individual defendants' breaches of their respective employment agreements has caused and continues to cause irreparable injury to DTN.  For example, a violation of a covenant not to compete is recognized by Kentucky law to warrant injunctive relief.  Allowing a competitor to continue to make use of DTN's confidential and proprietary business information and trade secrets, and to do business with and solicit DTN's customers and clients while violating several terms of a restrictive covenant also would inflict injury on DTN for which there is no adequate remedy available at law. Accordingly, DTN is entitled to injunctive relief and specific performance.

## COUNT 3
### BREACH OF THE PIIA
### (AGAINST LYNCH, JACKSON, LEONARD, MAIER AND VOGT)

117.    DTN restates and realleges all prior allegations as though restated here in full.

– 27 –

118.    Each individual defendants' respective PIIA is a valid and enforceable contract.

119.    By engaging in the acts alleged herein, the individual defendants breached multiple provisions of the PIIA, including but not limited to paragraphs 4, 5, and 6.

120.    As a direct result of these breaches, DTN has lost profits, and its corporate name, its goodwill, and its standing with its customers and in the marketplace in general has been damaged.

## COUNT 4
### TORTIOUS INTERFERENCE WITH EMPLOYMENT AGREEMENTS
### (AGAINST ALL DEFENDANTS)

121.    DTN restates and realleges all prior allegations as though restated here in full.

122.    Each of the defendants had actual knowledge of the contractual duties, confidentiality obligations, and restrictive covenants that each of the individual defendants owed to DTN.

123.    Despite knowing of these contractual obligations, and without privilege or justification, the Elite and the individual defendants intentionally and actively assisted, encouraged, and/or induced each other individual defendant to breach his contractual obligations to DTN.

124.    There is no legitimate business or other reason, justification, or privilege supporting or excusing the defendants' conduct.

125.    This tortious interference was malicious and done with intent to injure and/or oppress DTN.

126.    Defendants' actions described herein have caused DTN to sustain damages including, but not limited to, lost income, lost client relationships and future lost client

relationships, lost or diminished competitive advantages, and injury to its goodwill and reputation.

127.    Accordingly, DTN is entitled to relief including but not limited to compensatory and punitive damages, and disgorgement.

128.    Moreover, as a result of the defendants' unlawful interference, DTN has and will continue to suffer immediate and irreparable injury in violation of its rights unless the defendants are immediately restrained and permanently enjoined from such activities by order of this Court.  DTN has no adequate remedy at law or otherwise to address this injury.

## COUNT 5
### TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE
### (AGAINST ALL DEFENDANTS)

129.    DTN restates and realleges all prior allegations as though restated here in full.

130.    The defendants' acts, as set forth above, constitute an unlawful interference with DTN's existing and/or prospective business advantage.

131.    The defendants have intentionally, maliciously, and without privilege or justification, interfered with and continue to interfere with DTN's business relationships and prospective business relationships with car dealerships.

132.    As direct and proximate result of the defendants' unlawful activities, DTN has lost or is at risk of losing employees, customers and clients, and revenue and other income which would have been earned from them, and has suffered injury to its goodwill and reputation.

133.    As a direct and proximate result of the defendants' tortious interference, DTN has suffered loss, damage, and injury that is ongoing and continuing.

134.    The defendants' actions were intentional, malicious, or done with intent to injure and/or oppress DTN, entitling DTN to punitive damages.

135.    Moreover, as a result of the defendants' unlawful interference, DTN has and will continue to suffer immediate and irreparable injury in violation of its rights unless the defendants are immediately restrained and permanently enjoined from such activities by order of this Court.  DTN has no adequate remedy at law or otherwise to address this injury.

## COUNT 6

### BREACH OF FIDUCIARY DUTY
### (AGAINST LYNCH, JACKSON, LEONARD, MAIER, AND VOGT)

136.    DTN restates and realleges all prior allegations as though restated here in full.

137.    By virtue of the obligations required by their jobs, the individual defendants' access to DTN's confidential information, and the explicit contractual duties of confidentiality and non-competition, the individual defendants occupied a position of the utmost trust and confidence with DTN, giving rise to fiduciary duties to DTN, which DTN relied on in entrusting them with substantial responsibilities and handling sensitive DTN deals and confidential information.

138.    The individual defendants breached their fiduciary duties to DTN by, among other things:

(a)    Planning and preparing to create, own, operate, and work for a business that competes with DTN;

(b)    Planning to leave DTN to work for a competitor;

(c)    Failing to devote all of their time to DTN employment;

(d)    Taking and/or misusing confidential and proprietary DTN business information and trade secrets and sharing such information with others;

(e)    Misusing DTN resources;

(f)    Acting disloyally to DTN while being employed by DTN; and

(g)    Directly and/or indirectly competing with DTN.

139.    As a direct result of these breaches and wrongful conduct, the individual defendants have profited at the expense of DTN, DTN has lost profits, and its goodwill, its standing with its customers and in the marketplace in general has been damaged.

140.    In addition to causing monetary damages to DTN, the individual defendants' breaches of fiduciary duty have caused and continue to cause irreparable injury to DTN. For example, there is no adequate remedy available at law to address Lynch's continued misuse of highly confidential and proprietary business information and trade secrets belonging to DTN. Accordingly, DTN is entitled to injunctive relief.

141.    And because the individual defendants' violations of their fiduciary duties were undertaken with oppression, fraud, or malice, DTN is further entitled to punitive damages.

## COUNT 7
### BREACH OF DUTY OF LOYALTY
### (AGAINST LYNCH, JACKSON, LEONARD, MAIER, AND VOGT)

142.    DTN restates and realleges all prior allegations as though restated here in full.

143.    By virtue of their employment and his explicit duties of confidentiality and non-competition, the individual defendants owed fundamental duties of loyalty, good faith, and fair dealing to DTN under Kentucky common law.

144.    The individual defendants breached those duties by, among other things:

(a)    Planning and preparing to create, own, operate, and work for a business that competes with DTN;

(b)    Planning to leave DTN to work for a competitor;

(c)    Failing to devote all of his time to DTN employment;

(d)    Taking and/or misusing confidential and proprietary DTN business information and trade secrets;

(e)    Misusing DTN resources;

(f)    Soliciting DTN clients;

(g)    Misappropriating DTN business opportunities for personal gain;

(h)    Acting disloyally to DTN while being employed by DTN, for example, by secretly acquiring confidential and proprietary DTN business information, including the Database, while actively pursuing and planning work with a DTN competitor; and

(i)    Directly and/or indirectly competing with DTN before and following their departure from DTN by using misappropriated documents and files, including the Database.

145.    As a direct result of these breaches, the individual defendants have profited at the expense of DTN, DTN has lost profits, and its goodwill, its standing with its customers and in the marketplace in general has been damaged.

146.    In addition to causing monetary damages to DTN, the individual defendants' breaches of their duty of loyalty have caused and continue to cause irreparable injury to DTN. For example, there is no adequate remedy available at law to address Defendants' continued misuse of highly confidential and proprietary business information and trade

secrets belonging to DTN.  Accordingly, DTN is entitled to injunctive relief.

147.    And because Defendants' violations of their duties were undertaken with oppression, fraud, or malice, DTN is further entitled to punitive damages.

## COUNT 8
### TRESPASS TO CHATTEL
### (AGAINST LYNCH AND ELITE)

148.    DTN restates and realleges all prior allegations as though restated here in full.

149.    Lynch intentionally intermeddled with DTN's Database.

150.    The Database was in the possession of DTN.

151.    By extracting, downloading, and sending the Database to his personal email, sharing them with a DTN competitor, and using it to compete with DTN, Lynch and Elite impaired the value of the Database to DTN.

152.    By using the Database for their own benefit, Lynch and Elite impaired the value of the Database to DTN.

153.    DTN has been harmed and continues to be harmed by Lynch's and Elite's trespass.

154.    And because Lynch's and Elite's trespass was undertaken with oppression, fraud, or malice, DTN is further entitled to punitive damages.

## COUNT 9
### FEDERAL TRADEMARK INFRINGEMENT
### (AGAINST MAIER, LYNCH, AND ELITE)

155.    DTN restates and realleges all prior allegations as though restated here in full.

156.    Maier's, Lynch's, and Elite's continued use of their DTN email addresses, which contain the marks "Dealer Trades" and "GM Trades," to promote and provide their services is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or

– 33 –

approval of their services, and/or deception as to affiliation, connection, or association between DTN and Maier's, Lynch's, and/or Elite's services.

157.    Maier's, Lynch's and Elite's acts described herein infringe DTN's marks and damage and irreparably harm DTN and DTN's business, reputation, and goodwill.

158.    Unless enjoined by this Court, Maier, Lynch, and Elite will continue to infringe DTN's marks and will continue to damage DTN and injure DTN's business, reputation, and goodwill, thereby causing continuing irreparable harm to DTN.

159.    Maier's, Lynch's, and Elite's unauthorized use in commerce of DTN's marks in a manner that suggests an affiliation or endorsement of DTN or its services has caused, is likely to cause, and will continue to cause, confusion, mistake, and/or deception as to the origin, sponsorship, or approval of Maier's, Lynch's, or Elite's services, and deception as to affiliation, connection, or association between DTN and Maier, Lynch, and/or Elite, and constitutes trademark infringement in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT 10
### UNFAIR COMPETITION UNDER THE LANHAM ACT AND KENTUCKY LAW (AGAINST LYNCH, MAIER, AND ELITE)

160.    DTN restates and realleges all prior allegations as though restated here in full.

161.    As a result of Lynch's, Maier's, and Elite's repeated actions, communications, and solicitations deceptively suggesting an association between DTN and Lynch's or Maier's or Elite's services, and suggesting that DTN was providing Lynch's or Maier's or Elite's services, Lynch, Maier, and Elite promoted and advertised their new business in a manner that is deceptive and confusing to viewers to the detriment of DTN, thus constituting unfair competition under the Lanham Act and Kentucky common law.

162.    Defendants' actions have caused, and will continue to cause, damage and irreparable injury to DTN and its business, reputation, and goodwill, and will continue to cause irreparable harm unless and until this Court enjoins the illegal acts.

*       *       *       *

WHEREFORE, DTN respectfully requests:

(1) Judgment in its favor;

(2) Compensatory damages, including disgorgement of profits and liquidated damages, in an amount to be determined at trial;

(3) Punitive damages against all Defendants;

(4) Exemplary damages under the DTSA and KUTSA;

(5) An award of costs and attorney's fees;

(6) Preliminary and permanent injunctive relief; and

(7) All other relief to which DTN is entitled as the Court deems appropriate.

/s/ Jeffrey S. Moad
Jeffrey S. Moad
Zachary D. Losey
STITES & HARBISON, PLLC
400 W. Market Street, Ste. 1800
Louisville, KY 40202
Telephone:  (502) 587-3400
Email:  jmoad@stites.com
            zlosey@stites.com

Robin E. McGuffin
Kyle S. Schroader
STITES & HARBISON, PLLC
250 West Main Street, Suite 2300
Lexington, KY 40507
Telephone:  (859) 226-2300
Email:  rmcguffin@stites.com
            kschroader@stites.com

Counsel for Dealer Trade Network

# VERIFICATION

I, Christian Miller, in my capacity as Chief Executive Officer of Dealer Trade Network Holdco, LLC d/b/a Dealer Trade Network, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the foregoing is true and correct.  Executed on August 7, 2023.

_____
Christian Miller
Chief Executive Officer
Dealer Trade Network Holdco, LLC d/b/a Dealer Trade Network